Kathy Darlene **EIDSON**, on behalf of herself and all other persons similarly situated, Plaintiff-Appellant,

v.

Samuel R. **PIERCE**, Jr., in his capacity as Secretary of the Department of Housing and Urban Development, et al., Defendants-Appellees.

Sandra L. **GERMAIN**, et al., Plaintiffs-Appellants,

v.

**RECHT–GOLDIN–SIEGEL PROPERTIES**, et al., Defendants-Appellees.

Nos. 83–2414, 83–2559.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1984.

Decided Sept. 24, 1984.

Rehearings Denied Dec. 6, 1984.

**454**

Chris Sautter, Legal Services Organization of Ind., Bloomington, Ind., for plaintiffs-appellants.

Mark W. Pennak, Civil Div., Appellate Staff, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

CUDAHY, Circuit Judge.

These two consolidated appeals concern the due process dimensions of the denials of plaintiffs' applications to rent housing owned and operated by defendant private owners. The housing is subsidized by the federal government under Section 8 of the United States Housing Act, as amended, 42 U.S.C. § 1437f (1982) ("Section 8"). The central feature of the Section 8 programs at issue here is that private landlords agree to rent their property to eligible low-income families, and in return, the federal government contracts with the landlord to pay the difference between a fair market rent and the amount the low-income tenants can afford.

Under Section 8, the private owner is responsible for managing the property and for selecting the tenants, but the owner's discretion in selecting tenants is to some extent circumscribed by statute and regulation. These plaintiffs are eligible for Section 8 housing and are or were on waiting lists for the housing. The issue in this case is whether they have a constitutionally pro-tected property interest—a "legitimate claim of entitlement"—in Section 8 housing entitling them to procedural rights under the fifth amendment. In each case the district court held that the Section 8 program does not create such a legitimate claim of entitlement. We agree that neither the statute in question nor any regulations promulgated under it create a property interest in, or a legitimate claim of entitlement to, Section 8 benefits in these plaintiffs, and we therefore affirm.

I.

A. EIDSON v. PIERCE

Plaintiff Kathy Eidson brought a putative class action suit against the Secretary of Housing and Urban Development (the "Secretary"), Henderson Court Associates and Cardinal Management Company, Inc. ("Cardinal"). Henderson Court Associates is a partnership which owns the Henderson Court Apartments ("Henderson Court") located in Bloomington, Indiana, and which receives federal housing assistance payments under the Section 8 new construction subprogram regulated under 24 C.F.R. Part 880. Cardinal is an Indiana corporation managing Henderson Court Apartments under contract with the owner. ·

Eidson is unemployed and has three children. Her complaint states that her only source of income is the Aid to Families with Dependent Children program, and that she and her children are eligible to receive Section 8 housing benefits. Eidson alleges that in 1979 she applied for an apartment in Henderson Court, and that in 1981 Henderson Court denied her application in a letter stating:

> Based on the information I received from your previous landlords I will not have an apartment for you, and your application will be taken off file. If you have any questions please contact the office.

Plaintiff thereafter brought this suit claiming that the defendants violated her due process rights under the fifth amendment by allegedly failing "to maintain and apply uniform, ascertainable standards for the selection of tenants" (First Claim), "to

provide adequate and specific written reasons for denial of admission" (Second Claim) and "to provide an opportunity for an informal hearing before an impartial hearing officer for individuals and families who have been denied admission" (Third Claim). The plaintiff seeks to enjoin the defendants from enforcing existing Section 8 tenant selection policies as well as an injunction requiring the Secretary to develop a proposal to remedy the alleged failures.

The private defendants moved to dismiss plaintiff's complaint for failure to state a claim upon which relief could be granted, arguing, *inter alia*, that the plaintiff did not have a constitutionally protected "property interest" in securing an apartment at Henderson Court. Later, the Secretary moved to dismiss the complaint for failure to state a claim under the fifth amendment, contending that (1) plaintiff did not have a legitimate claim of entitlement to an apartment at Henderson Court and (2) the actions of the private defendants were not fairly attributable to the Secretary under the fifth amendment. Plaintiff, in turn, moved for certification of a class.

The district court granted the defendants' motions to dismiss the complaint for failure to state a claim and denied plaintiff's motion for class certification as moot. Focusing initially on the applicable regulations, the court ruled that a private owner, unlike a public housing authority, "is under no regulatory obligation to provide an informal hearing or an impartial review to an applicant who has been denied tenancy." On the constitutional issue, the district court concluded that "plaintiff as a potential tenant did not have a property interest in a Section 8 subsidized apartment in Henderson Court."

## B. GERMAIN v. RECHT–GOLDIN–SIEGEL PROPERTIES

Defendant Grant Park is a general partnership which owns Grant Park Square Apartments in South Milwaukee, Wisconsin. Grant Park Apartments is permanently financed by the Wisconsin Housing Financing Authority (the "WHFA"), a non-defendant public entity created pursuant to Wis.Stat. §§ 234.01 *et seq.* The apartment project is a new construction project regulated under 24 C.F.R. Part 883. Grant Park entered into a Housing Assistance Payments ("HAP") contract with WHFA for the receipt of Section 8 housing subsidies provided to WHFA by the Department of Housing and Urban Development ("HUD"). Plaintiffs Jesus Gonzales, Faye Sieg, and Milton Frankwick applied for housing at Grant Park Apartments.

Defendant North Meadows is a partnership and owner of North Meadows Apartments—No. 3, a Part 880 new construction project in Milwaukee, Wisconsin. As a Part 880 project, North Meadows entered into a HAP contract directly with HUD. Plaintiff Sandra Germain applied for housing at North Meadows.

Defendant Recht-Goldin-Siegel Properties is an unincorporated association and manages North Meadows Apartments and Grant Park Apartments pursuant to a contract with North Meadows and Grant Park. In this capacity, Recht-Goldin-Siegel assumed the management responsibilities of the owners and considered the applications of each of the named plaintiffs.

WHFA assumed the responsibility for "project development and for supervision of the development, management and maintenance functions of Owners." 24 C.F.R. § 883.302(a) (1978). *See also* 24 C.F.R. § 883.201(b) (1983). WHFA's regulation of tenant selection is essentially the same as HUD's. While WHFA obtains a copy of approved applications, it does not review applications disapproved by owners. WHFA does not have any formal procedure by which applicants may challenge an owner's rejection of an application.

Recht-Goldin-Siegel reviewed plaintiffs' applications in accordance with its own tenant selection procedures. Upon receiving an application from an interested person, the application would be processed for a credit check, a landlord check and a check as to whether the person met the Section 8 eligibility requirements. Occasionally, if

thought necessary, Recht-Goldin-Siegel would visit the home of the applicant. If an application is denied, the applicant is given the opportunity to meet with Recht-Goldin-Siegel, at which time the applicant is given a summary of the information forming the basis of the denial. In reaching these decisions, Recht-Goldin-Siegel follows what purports to be "just the common sense approach."

In the case of Sandra Germain, Recht-Goldin-Siegel initially denied in a letter Ms. Germain's application for a duplex project operated by Recht-Goldin-Siegel. As explained in a subsequent letter, this denial was based on a home visit to plaintiff's apartment which was prompted by adverse comment from her then-current landlord. Subsequently, Ms. Germain applied for housing at North Meadows. This application was denied in a letter dated February 12, 1981, in which she was advised that the denial was based on confidential information received during the investigation of the application and that a more specific explanation could be obtained upon written request. After Ms. Germain requested more specific reasons for the denial, Recht-Goldin-Siegel explained that the denial was based on the previous denial and invited her to call if she had any further questions. In a subsequent telephone conversation, Ms. Germain was informed that "the refusal was due to unfavorable landlord reports."

The application of Jesus Gonzales for housing at Grant Park was denied in May 1980. In response to Mr. Gonzales' request, in December Recht-Goldin-Siegel advised Mr. Gonzales in a letter that the denial was based on confidential information received during the investigation of the application and that a more specific explanation could be obtained upon written request. Eventually, Recht-Goldin-Siegel responded to an inquiry from legal counsel for Mr. Gonzales and advised that, "Mr. Gonzales was denied because of an unfavorable renting record with a previous landlord."

Faye Seig's application for housing at Grant Park was denied in a May 1981 letter. The denial was based on Recht-Goldin-Siegel's "judgment call" when an investigation of her application revealed an unpaid judgment of $404.00, thereby suggesting "poor credit" and an alleged false representation by Ms. Seig that she had custody of one daughter when the daughter was in the foster care of a grandmother. These reasons were orally communicated to Ms. Seig and were confirmed in a letter in which Ms. Seig was advised that her application would be reconsidered if she could show that the problems had been rectified.

Plaintiff Milton Frankwick applied for housing at Grant Park and a non-Section 8 project operated by Recht-Goldin-Siegel. In May 1981, Recht-Goldin-Siegel called Mr. Frankwick and advised him that his application "had not been processed because he was on a non-resident waiting list and residents were given preference at Grant Park Square." He was also advised that "it appeared that [he] was in § 8 housing and that R–G–S did not consider for § 8 tenancy persons who were already in § 8 housing." These reasons were confirmed by letter.

The Wisconsin plaintiffs filed their class action suit on May 8, 1981. They alleged that defendants had violated the due process clauses of the fifth and fourteenth amendments by failing to provide plaintiffs and other class members with various procedural and substantive rights. The complaint relied on 42 U.S.C. § 1983 and also directly on the fifth amendment. The plaintiffs sought injunctive relief requiring the Secretary to promulgate regulations establishing various procedural rights, including a right to a prompt written determination of Section 8 eligibility based on ascertainable admission standards, a right to notice of denial "detailing rational, non-arbitrary reason(s) and specific facts supporting a denial of eligibility," a right to notice of a meaningful hearing opportunity with HUD staff, and a right to a promptly scheduled administrative evidentiary hearing (with trial-type rights of cross-examination) before an impartial decisionmaker. In

December 1982, plaintiffs moved to expand a previously certified class and for partial summary judgment seeking the declaratory and injunctive relief specified in the complaint. The Secretary and the private defendants opposed the plaintiffs' motion and moved for summary judgment.

In an order entered in July 1983, the district court granted the defendants' motion and dismissed the complaint holding that the plaintiffs did not have "a legitimate claim of entitlement" to the receipt of Section 8 benefits. 567 F.Supp. 384 (E.D. Wis.1983).

## II.

At the heart of this case is the fact that there are not enough Section 8 housing units to accommodate all who are eligible and willing to take them. This case thus involves the processes used to allocate these limited and valuable benefits among a large number of eligible applicants. At issue are the rights not only of those plaintiffs who were denied Section 8 benefits but also of those who received those benefits in the plaintiffs' stead.

In determining whether these plaintiffs have a constitutionally protected property interest in Section 8 benefits in these privately-owned projects, our inquiry is whether the plaintiffs have a "legitimate claim of entitlement" to those benefits. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Court explained in *Roth:*

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily un-

dermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Id.* The sources of plaintiffs' asserted property rights are Section 8 and HUD's accompanying regulations, policies and contracts, and we turn now to those sources.

Section 8 authorizes the Secretary to make "assistance payments ... with respect to existing, newly constructed, and substantially rehabilitated housing" for the purposes "of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (1982).[1] Under the contracts which are made to provide this assistance, the Secretary's Section 8 payments to the owner make up the difference between a maximum fair market rent established in the contract and the amount the tenant is able and required to pay. 42 U.S.C. § 1437f(c)(3) (1982). Congress left responsibility for operation and management, including the selection of tenants, with the private owner. Thus, where the Secretary has contracted directly with the private owner (Part 880), Section 8 directs that the contract *"shall* provide that all ownership, management, and maintenance responsibilities, *including the selection of tenants* and the termination of tenancy, *shall* be assumed by the owner (or any entity ... with which the owner may contract for the performance of such responsibilities), except that the tenant selection criteria shall give preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking housing assistance under this section." 42 U.S.C. § 1437f(e)(2) (1982) (emphasis supplied). Similarly, Section 8 provides that contracts between a state public housing agency and a private owner with respect to existing housing units (Part 883)

---

1. Congress substantially amended Section 8 as part of the Housing and Urban-Rural Recovery Act of 1983, Pub.L. 98–181, 97 Stat. 1153. Section 203 of the 1983 Act amended 42 U.S.C. § 1437f(d)(1)(A) and (e)(2) by creating a statutory preference for families spending more than 50 percent of their income on rent. Section 209 repealed the Secretary's authority to enter into future contracts for new construction and substantial rehabilitation projects. 1984 U.S.Code Cong. & Ad.News 1153, 1178, 1183.

"*shall* provide (with respect to any unit) that—(A) *the selection of tenants* for such unit *shall* be the function of the owner, . . . except that the tenant selection criteria used by the owner shall give preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance under this section." 42 U.S.C. § 1437f(d)(1)(A) (1982) (emphasis supplied).

The cases before us involve two types of Section 8 subprograms. Both *Eidson v. Pierce* and *Germain v. Recht-Goldin-Siegel Properties* concern private housing constructed under the new construction subprogram regulated under Part 880 of the regulations, 24 C.F.R. Part 880. *Germain* also involves a private housing project financed by a state housing agency and regulated under Part 883 of the regulations, 24 C.F.R. Part 883.

Under the former regulations applicable to the Part 880 projects involved in the present case, 24 C.F.R. Part 880 (1978), the private owner made a construction proposal to HUD.[2] Later there was a Housing Assistance Payments ("HAP") Contract between the owner and HUD whereby HUD would make monthly payments to the owner to help an eligible family lease an assisted unit. 24 C.F.R. § 880.102 (1978). In this subprogram, the owner is responsible for the "[p]erformance of all management functions including the taking of applications" and the "selection of Families." 24 C.F.R. § 880.119(a)(3) (1978). The owner

must not only determine whether an applicant is eligible but must also select the actual tenants from among the eligible applicants. 24 C.F.R. § 880.218(b)(1) (1978). The owner determines whether the applicant meets the statutory eligibility requirements and whether the applicant is "otherwise acceptable." 24 C.F.R. § 880.218(b)(3) and (4) (1978).[3]

With respect to Part 883, under the regulations applicable to the project in the Wisconsin case, 24 C.F.R. Part 883 (1978), private owners submitted proposals for new construction or for substantial rehabilitation projects to a state agency, which eventually financed the project and certified to HUD that it met federal requirements. 24 C.F.R. §§ 883.305–.309 (1978).[4] In due course the state agency made a HAP contract with the owner for the payment of housing assistance payments received from HUD with respect to the owner's project. 24 C.F.R. §§ 883.202 and 883.317 (1978). Part 883 of the former Section 8 regulations accorded the same discretion in tenant selection to private owners under the Part 883 subprogram as under the Part 880 subprogram. Thus, the owner's responsibilities include selection of tenants from among eligible applicants. 24 C.F.R. §§ 883.215(a)(3) and 883.318(b)(1) (1978). The owner determines whether the applicant meets the statutory eligibility requirements and whether the applicant is "otherwise acceptable." 24 C.F.R. § 883.318(b)(3) and (4) (1978).[5]

2. The current Part 880 regulations are applicable only to projects selected after the effective date of those regulations. *See* 24 C.F.R. § 880.-104 (1983).

3. Current regulations also give the owner broad responsibility. Thus, "[t]he owner is responsible for all management functions (including selection of tenants, reexamination of family incomes, evictions and other terminations of tenancy, and collection of rents) and all repair and maintenance functions . . . ." 24 C.F.R. § 880.601(b) (1983). These current regulations indicate that the owner may not only reject applicants for failure to meet the family composition and income eligibility requirements of Section 8, but may also determine whether an applicant is "otherwise acceptable" and may reject those who are not. 24 C.F.R. § 880.-603(b)(2) and (3) (1983).

4. The current Part 883 regulations apply only to projects for which initial applications were submitted after the effective date of those regulations. *See* 24 C.F.R. § 883.105 (1983).

5. The current Part 883 regulations provide that the private owner "is responsible for all management functions, including marketing, selection of tenants, reexamination of family incomes, evictions and other terminations of tenancy and collection of rents." 24 C.F.R. § 883.-103(d) (1983). *See also* 24 C.F.R. § 883.101(f) (owner responsible for selection of tenants); 24 C.F.R. § 883.702(b) (same). While the owner is required to apply HUD eligibility requirements and "accept applications . . . in the form prescribed by HUD," 24 C.F.R. § 883.704(a), the owner may also determine whether an eligible applicant is "otherwise acceptable," 24 C.F.R.

The HUD "Handbook" (Handbook Transmittal No. 4350.3), which is provided to owners, managing agents and HUD field offices for use in the Section 8 programs, might be an additional source of plaintiffs' asserted entitlement. *See Perry v. Sindermann*, 408 U.S. 593, 599–602, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972). The Handbook confirms, however, the independent role of the owners in tenant selection. The Handbook states, for example, that "each Owner should develop reasonable Tenant selection procedures ... designed to select applicants who will not only meet the Tenant eligibility requirements for HUD's subsidy programs *but will also be responsible Tenants.*" HUD Handbook ¶ 3–8, Germain App. at 38 (emphasis supplied).

On the other hand, the Section 8 subprograms which we have discussed also circumscribe to some extent the owner's discretion in selecting tenants. For example, the statute provides for preferences for families in substandard housing and for those involuntarily displaced. 42 U.S.C. § 1437f(d)(1)(A) and (e)(2) (1982). Local residency requirements are prohibited, although some preference for local residents may be permitted. 24 C.F.R. § 880.-218(b)(1) (1978). The owner must also seek to achieve certain mixes of income classes in the units. 24 C.F.R. §§ 880.117 and 883.716 (1978). In addition, the owner must market the units according to a HUD-approved plan to promote equal opportunity in housing. 24 C.F.R. §§ 880.218(a) and 883.318(a) (1978). Finally, HUD imposes certain procedural requirements for the rejection of applicants, involving notice to the applicant of the reasons for the rejection and an opportunity for the applicant to meet with the owner to review the decision. HUD Handbook ¶ 3–25, Germain App. at 44.

From the foregoing review of the Section 8 program, the following salient features emerge. First, Section 8 was intended to benefit lower-income families by providing decent housing at affordable prices. At the same time, however, there is a substantial gap between Section 8 resources and the needs of all of those eligible. To allocate Section 8 benefits among the eligible recipients, the Section 8 program relies on private owners of assisted property to select tenants from among eligible applicants. The selection of tenants is obviously not left to the owner's unfettered discretion. Section 8 requires the owner to apply the eligibility criteria based on income and family size. In addition, preference must be given to certain subclasses of eligible applicants, such a those who are involuntarily displaced. Nevertheless, Section 8 contemplates a selection process involving other, less tangible factors in addition to statutory eligibility. The owner may determine that a family is eligible and "otherwise acceptable," or the owner may reject an application based on statutory criteria or for "other reasons." The HUD Handbook makes it clear that the program contemplates private owners' determining whether eligible applicants are likely to be responsible tenants. The regulations and Handbook provide for certain informal procedures for rejected applicants, but those procedures fall short of the relief these plaintiffs seek.

In view of these salient features, we must locate the interests of these eligible Section 8 applicants against a background of jurisprudence dealing with the due process dimensions of various public benefit programs. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). As we view the case, the principal problem is whether the plaintiffs would be able to establish at a due process hearing facts which would entitle them to Section 8 benefits. *See Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483, 494–95 (9th Cir.1974) (Hufstedler, J., dissenting). Judge Hufstedler developed in her dissent in *Geneva Towers* the concept that a legitimate claim of en-

---

§ 883.704(b)(2), and may reject an applicant on grounds of statutory ineligibility or for "other reasons." 24 C.F.R. § 883.704(b)(3).

titlement is created only when the statutes or regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing. Her view has been followed by this circuit consistently in *Harlib v. Lynn*, 511 F.2d 51 (7th Cir.1975), *Davis v. Ball Memorial Hospital Association*, 640 F.2d 30 (7th Cir. 1980), and *Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir.1981).

In *Holbrook v. Pitt* we considered the due process rights of tenants in existing projects with HUD-insured and HUD-held mortgages, where the owners had entered into Section 8 contracts with HUD. *See* 24 C.F.R. Part 886 (1980). The tenants sought retroactive subsidy payments dating from the time the owners entered into the contracts. We held that those tenants were third-party beneficiaries of the relevant Section 8 contracts and that they had protected property interests in the retroactive benefits. 643 F.2d at 1276–79. The plaintiffs in *Holbrook* were already living in the assisted units and had thus been accepted by the landlord. There were no additional hurdles for those plaintiffs to jump. We also said:

> Thus, tenants are included in the class denominated in Count III only after they have been certified. *We therefore do not express any opinion on the district court's holding that non-certified tenants do not have a legitimate claim of entitlement under the due process clause. But see Ressler v. Landrieu,* No. A77–228C (D.Alas. March 6, 1980).

643 F.2d at 1278–79 (emphasis supplied). *Holbrook v. Pitt* involved a different Section 8 subprogram from the ones before us, but we now face a question analogous to the issue we expressly declined to decide in that case. The issue is whether eligible applicants for these Section 8 subprograms have a legitimate claim of entitlement to benefits before they are accepted by a private owner.

Plaintiffs rely primarily on *Ressler v. Pierce*, 692 F.2d 1212 (9th Cir.1982), in which the Ninth Circuit held that Section 8

applicants under the Part 886 Set-Aside program have a protected property interest in receiving Section 8 benefits. In *Ressler* the court grounded that property interest in the limitations on an owner's discretion in selecting tenants and on the congressional purpose of aiding lower-income families in obtaining decent housing. 692 F.2d at 1215. Relying on *Geneva Towers*, the court said that the named plaintiff in *Ressler* was "a primary beneficiary of the Section 8 program, and her receipt of benefits is closely monitored by HUD under the implementing regulations and guidelines." 692 F.2d at 1216.

As noted above, however, this circuit has consistently followed the reasoning of Judge Hufstedler's dissent in *Geneva Towers* rather than the majority opinion relied on in *Ressler*. In our view, that reasoning compels the conclusion that these plaintiffs do not have protected property interests. The plaintiffs' central difficulty may be framed by asking, as a practical matter, what would be at issue in the hearings plaintiffs seek.

The plaintiffs' applications were rejected on the basis of unfavorable information from prior landlords and credit checks. At first blush, such information appears to be similar to that involved in the termination of plaintiffs' welfare payments in *Goldberg v. Kelly. See* 397 U.S. at 256 n. 2, 90 S.Ct. at 1014 n. 2; *Kelly v. Wyman*, 294 F.Supp. 893, 899–900, 904–05 & nn. 32 & 33 (S.D.N. Y.1968) (opinion of three-judge panel in *Goldberg*). The information may well be of questionable reliability, and the plaintiffs here might, at hearings, be able to refute the damaging information which was ostensibly the basis for the rejections. But even if the plaintiffs proved that the information was false, they would still not be entitled to Section 8 housing. They are *entitled* to housing, as opposed to eligible for it, only after a private owner accepts their applications. The owner's decision is subject to some statutory, regulatory and contractual limits, but those limits apply only to *classes* of potential tenants. The law does not tell the owner how to choose

between two eligible individuals. The owner remains free to accept applications only from those persons he or she expects to be responsible tenants, and the Section 8 program does not constrain the owner's judgment on that question.[6]

Further, the neutral hearing officer plaintiffs seek to have adjudicate their factual disputes with defendants would, under Section 8, be unable to offer an effective remedy. Even if the hearing officer found that the damaging credit records or information from prior landlords were false, the hearing officer could not order the owner to accept the applicant as a tenant. Under Section 8, the owner would be free to reject the applicant even if the owner merely had doubts about the applicant's suitability.

That is the controlling difference between these cases and *Goldberg v. Kelly*, for a mandatory hearing would do little either to benefit the applicant or to promote the public interest. In *Goldberg* and numerous other public benefit cases, the law established eligibility criteria, and any person who satisfied those factual criteria was entitled to the benefits. A hearing would thus be an effective remedy for the individual because it would provide a reliable means for resolving disputed facts entitling the person to benefits. Section 8 is not, however, a simple entitlement program. The eligible recipient must be accepted by a private landlord in order to receive benefits. Factual findings at a hearing could therefore not entitle these plaintiffs to Section 8 benefits.

In addition, *Goldberg*-style hearings in public benefit programs are aimed in part at ensuring that benefits are distributed to the right people. The hearings thus protect both the interests of eligible beneficiaries and the public interest in implementing policies accurately. Mashaw, *"Rights" in the Federal Administrative State*, 92 Yale L.J. 1129, 1167 (1983). As the Supreme Court has applied *Goldberg*, "[h]earings are not to be conferred as a right unless they would have a significant probability of enhancing accurate policy implementation." *Id.* Hearings under these Section 8 programs would not enhance accurate policy implementation because Section 8 essentially has no policies for choosing among eligible applicants. Section 8 is aimed at providing benefits to a class of lower-income families, but the program establishes no preferences regarding the allocation of these scarce benefits among the eligible class members. Thus, from the perspective of Section 8's policies, there would be nothing to decide in due process hearings.

It is important to note that our conclusion does not rest solely on the fact that there are not enough Section 8 benefits to aid all who are eligible. In *Davis v. Ball Memorial Hospital Association*, 640 F.2d 30, 42 (7th Cir.1980), we held that indigent hospital patients had property interests created by the Hill-Burton Act, 42 U.S.C. §§ 291 *et seq.*, entitling them to hearings on the availability of free hospital care. In *Davis* there was the problem that there were probably more eligible indigent patients than the hospitals would be required

---

**6.** Several courts have found or assumed the existence of property interests for applicants under another Section 8 subprogram, under Part 882 of the regulations, involving existing housing. *Vandermark v. Housing Authority of City of York*, 663 F.2d 436, 442 (3d Cir.1981); *Baker v. Cincinnati Metropolitan Housing Authority*, 490 F.Supp. 520, 531–32 (S.D.Ohio), *aff'd*, 675 F.2d 836 (6th Cir.1982). *See also Ferguson v. Metropolitan Development & Housing Agency*, 485 F.Supp. 517, 521 (M.D.Tenn. 1980) (termination of Part 882 benefits). The Part 882 existing housing program differs in one vital respect from the Part 880 and Part 883 programs now before us. In the Part 882 existing housing program (also called the "Finders-Keepers" program), a local public housing authority certifies eligible families; a certified family then seeks to independently arrange a lease with a private owner. If the local housing authority approves the lease and the premises, the authority then makes payments to the owner on behalf of the eligible family. The courts in *Vandermark* and *Baker* concluded that eligible families had a protected property interest in the *certification*, which they needed to have an opportunity to receive benefits. That opportunity depended only on objective eligibility criteria for which hearings would be suitable. By contrast, the plaintiffs in the cases before us assert broader property rights; they claim not the opportunity to prove their eligibility but instead entitlement to the benefits themselves. *Baker* and *Vandermark* do not extend that far.

to treat on an uncompensated basis. In *Davis*, as here, there was a gap between eligibility and entitlement under the benefit program. 640 F.2d at 39. In spite of this circumstance, the *Davis* court found that Congress, based on its recognition that the patients had a private right of action against the hospital, intended them to have an enforceable interest for due process purposes. We believe that the case before us is distinguishable from *Davis* because there is nothing to suggest that Congress intended potential tenants of Section 8 projects to have enforceable rights to Section 8 housing in particular projects.[7]

However, the central difference between this case and *Davis* lies in the different methods for allocating scarce government benefits and the practical consequences of those methods for possible due process hearings. Entitlement to Hill-Burton benefits in *Davis* was established on essentially a first-come-first-served basis. 640 F.2d at 38. If the patient established facts showing his or her eligibility, and if the hospital had not yet met its financial obligations for the year, then the patient was entitled to the benefits. *Id.* at 42–43. Unlike Hill-Burton entitlement, Section 8 entitlements depend on discretionary judgments which, in some respects, are not constrained by any legal criteria. A hearing in *Davis* could establish entitlement; a hearing for these plaintiffs could not.

We do not mean to suggest that any element of discretionary judgment in determining the receipt of public benefits would defeat an asserted property interest. Elements of discretion or judgment are often involved in the application of legal criteria, and a hearing or judicial review might ensure that the discretion was exercised in accordance with the relevant criteria. *Cf. Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668

(1979) (parole); *Willner v. Committee on Character and Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) (admission to bar). The problem in this case is that an owner's judgment about a tenant's acceptability is not constrained by *any* legal criteria under Section 8. The statute, regulations and contracts suggest information which might be relevant, but they provide no guidance in weighing that information. Instead, the matter is left entirely to the owner's business judgment.

Plaintiffs also asked the district courts to order the private defendants to *develop* written, ascertainable criteria for judging an applicant's suitability as a tenant. Such criteria, if they existed and were genuinely "ascertainable," might provide a foundation for a legitimate claim of entitlement. *See Davis, supra,* 640 F.2d at 38 (hospital plan for allocating Hill-Burton Act services could give rise to specific entitlement). However, requiring private owners to develop "suitability" criteria with legal force would appear to be contrary to the assumptions of the Section 8 program, which intentionally leaves suitability decisions to the private owner's business judgment. Upon reflection, that may be the only way to deal with such judgments, which involve intangible factors and unquantifiable—perhaps intuitive—judgments. The issue, after all, is not only who receives Section 8 benefits in a particular project but also who will gain temporary possession of the owner's property. Any lessor risks his property by leasing it, and Section 8 permits owners to use their own discretion in deciding which applicants are acceptable risks. While an owner's judgment about an applicant's suitability would certainly take account of the applicant's record of paying rent, landlord recommendations, housekeeping habits, and perhaps credit references,[8] such infor-

7. We do not address here all possible methods of enforcing the numerous statutory, regulatory and contractual obligations of Section 8 owners. *Cf. Price v. Pierce,* No. 83 C 6291 (N.D.Ill. Nov. 28, 1983) (action to compel full use of available Section 8 funds). Our discussion is limited to the claimed "entitlement" of Section 8 applicants.

8. These sources of information are spelled out in the HUD Handbook ¶ 3–9 "Screening Criteria." That section also states:

HUD supports the Owner's desire to select responsible Tenants. Owners are expected to exercise sound judgment in the Tenant selection process. The fact that an applicant qualifies for program benefits does not mean that

mation cannot determine the decision. Those are potential sources of relevant information, but it appears to be virtually impossible to state in *criteria with legal force* which applicants would be suitable tenants. The decision is thus subject to far fewer legal constraints than even the parole decisions in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

Our result, of course, appears to conflict with that reached in *Ressler v. Pierce, supra*, where the Ninth Circuit found that Section 8 applicants had a legitimate claim of entitlement to benefits in part by virtue of their membership in a class of individuals whom the Section 8 program was intended to benefit. *Ressler* relied on a Section 8's statement of purpose:

> For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section.

42 U.S.C. § 1437f(a) (1982). This statement of purpose is similar to the one upon which the majority relied in *Geneva Towers*. But, as we have noted, this circuit has followed Judge Hufstedler's dissent rather than the majority in that case.

In *Ressler*, the court also found that, despite the statutory provision that "the selection of tenants ... shall be the function of the owner," 42 U.S.C. § 1437f(d)(1)(A) (1982), the regulations and guidelines promulgated under the statute "closely circumscribe" an owner's discretion and therefore support an entitlement for applicants. 692 F.2d at 1215.[9] We cannot entirely agree with this analysis.

The cited limitations affect the allocation of Section 8 benefits among certain sub-

classes of eligible persons. For example, the owner must give preference to families who occupy substandard housing or who are involuntarily displaced. Also, the regulations provide for marketing plans that promote equal opportunity to receive assisted housing, and the regulations require some owners to rent to a certain percentage of "very low-income" families. These criteria which benefit certain subclasses of eligible recipients do not, however, affect an owner's choice between two similar, eligible *individual* applicants. The law does not tell the owner how to decide who is more likely to be a responsible tenant, and the law does not question the owner's decision so long as it does not involve invidious discrimination. Although, as we have noted, the statute and HUD's administrative guidelines provide some standards of eligibility, reliance on these alone does not take into account an owner's discretion and therefore can hardly furnish an adequate framework for due process hearings to distinguish "worthy" from "unworthy" applicants.

We believe—without appraising the merits of its decision—that Congress intended that a rent subsidy be paid on behalf of only those tenants whom an owner has selected. But broad discretion was left in the owner to make the selection. In applying here the approach of Judge Hufstedler in her dissent in *Geneva Towers*, we do not suggest that this is in every detail the only proper analysis in this circuit for entitlement cases. We do believe, however, that it is an analysis which emphasizes in the present circumstances the practical difficulty of choosing among claimants, the merits of whose claims are largely a matter of owner discretion, in due process hearings.

These plaintiffs obviously have compelling needs for, and claims to, low-cost Section 8 housing, but so, also, do many other

---

he/she is a suitable Tenant. Owners may consider the following factors when screening applicants. These factors are not all inclusive and the absence of any of these factors is not sufficient to reject an applicant.

**9.** We also note that the named plaintiff in *Ressler* was already a tenant in an assisted project

and the owner had thus already found her to be an acceptable tenant. 692 F.2d at 1214. However, the class in *Ressler* apparently included persons who had not yet been selected as tenants.

persons not before us. The purpose of Congress to provide housing benefits of the class of low-income families is clear. However, the class of eligible recipients is unlikely to benefit from elaborate and expensive procedures to select the fortunate recipients without statutory—or perhaps even rational—standards. Such procedures could only add to the cost of the program and reduce the amount of benefits available to low-income families.

Finally, we reach our conclusion in view of the procedures and substantive criteria HUD has adopted and required owners to adopt in the tenant selection process. If the allocation of these scarce public benefits were utterly uncontrolled, it is possible that the program would offend "the concepts of fairness and nonarbitrariness which are at the heart of the constitutional requirement of due process of law." *Holbrook v. Pitt, supra,* 643 F.2d at 1279. *Cf. Holmes v. New York City Housing Authority,* 398 F.2d 262, 264–65 (2d Cir.1968) (allegations of chaotic system for allocating public housing with potential for abuse, favoritism and arbitrariness); *Daubner v. Harris,* 514 F.Supp. 856, 869 (S.D.N.Y. 1981), *aff'd mem.* 688 F.2d 815 (2d Cir. 1982). In the Section 8 program at issue here, HUD regulations prohibit a number of practices potentially subject to abuse by owners, and owners are required to explain their rejections of applications and to meet with rejected applicants who seek reconsideration of the decision. We doubt that any more could be meaningfully required so long as the owner remains free to reject the applicant on any of numerous grounds. But the absence of these minimal requirements would be most troubling.

Since, like the district courts which decided these cases in the first instance, we have found and relied upon the absence of a legitimate claim of entitlement, we do not reach the defendants' argument that the conduct of the owners in allocating these scarce federal benefits among eligible applicants is not "federal action" subject to the fifth amendment.

AFFIRMED.