WALD, Circuit Judge,
dissenting in part:
I part from the majority on the issue of whether families eligible for emergency shelter under the District’s laws and regulations have a “property interest” which triggers some form of procedural protection under the Fifth Amendment Due Process Clause. I agree with the district court that families who meet the threshold eligibility requirements of the statute and whose place on the waiting list has been reached are entitled to some modicum of procedural due process by virtue of the statutory mandate of the program, and the Shelter Office’s policy and practice in the administration of the program. Thus I respectfully dissent from that *-1536 portion of the majority opinion finding no entitlement worthy of procedural protection.
In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 38 L.Ed.2d 548 (1972), the Supreme Court defined the parameters of Fifth Amendment “property interests” to incorporate the fundamental tenets of the “ancient institution of property.” Id. at 577, 92 S.Ct. at 2709. According to these enduring principles, a person has no “property” interest in a thing simply because he has an “abstract need or desire for it,” or a “unilateral expectation of it.” Id. Rather, he must have a “legitimate claim of entitlement to it,” id. at 577, 92 S.Ct. at 2709; a claim based on some “rule[] or understanding[ ]” that “secure[s]” the benefit for the claimant and supports his claim of entitlement. Id. Thus it is common ground that a statute declaring that people meeting certain eligibility criteria will receive a government benefit secures the benefit for those people, just as a blanket of common law rules secures more traditional forms of private property for individuals. Id. (citing Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). And correlatively the fact that only those who meet specified criteria are entitled to the benefit does not mean that due process doesn’t enter the picture until eligibility has been conclusively proved, since this approach would deny the very procedures needed to demonstrate that a property interest exists in the first place. See id. (“[T]he welfare recipients in Goldberg v. Kelly ... had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.”); see also Griffeth v. Detrich, 603 F.2d 118 (9th Cir. 1979) (applicants for public assistance have a property interest in the benefit).[1]
' The Roth Court’s distinction between “abstract need[s] or desire[s]” or “unilateral ex-pectationfs],” on the one hand, and “legitimate claim[s] of entitlement” on the other, mirrors the old common law distinction between “bare expectancies,” which are not recognized as legitimate property, and future interests, which are. See Lewis M.- Simes & Alian F. Smith, The Law of FutuRe Interests § 391 (2d ed.1956) (distinguishing future interests from “bare expectancies”); 1 American Law of Property § 4.1 (A James Cas-ner ed., 1st ed.1952) (same); see also Gregory S. Alexander, The Concept of Property in Private and Constitutional Law: The Ideology of the Scientific Turn in Legal Analysis, 82 Colum. L.Rev. 1545, 1570-71 (1982). The clearest example of the former is an apparent or presumptive heir who has a “unilateral expectation” of inheriting; this bare expectancy is like a fish that one hopes to catch, or a bird in the bush — it is not property. The concept of property exists to “protect those claims upon which people rely in their daily lives,” Roth, 408 U.S. at 577, 92 S.Ct. at 2709, not to enable people to claim “ownership” of whatever they think they deserve. On the other hand traditional property law readily acknowledges that, if there is some formal statement or understanding establishing that a person can expect a benefit in the future provided that specified contingencies are satisfied, that person does have a property interest — specifically, a future interest — in the benefit, even if the specified contingencies may never occur. Although the privilege of possession or enjoyment is deferred for the holder of a future interest, it is “of the essence” that such an interest “is property which now exists.” See 1 American Law of Property § 4.1, at 405. Examples of such future interests are contingent remainders,[2] vested remainders subject to complete defea- *-1535 sanee,[3] and most executory interests [4] where the right of actual possession is subject to conditions which may or may not occur. See id. Although the holder of such a future interest may realistically have a smaller probability of ever gaining possession of the benefit than the holder of a “bare expectancy,” the former’s interest receives higher priority in the eyes of the law because unlike the latter’s it is not merely subjective or “unilateral,” but the product of a joint agreement with the present owner.
Applying these bedrock principles of property law to the facts of this dispute,[5] I find myself in disagreement with the majority’s unequivocal statement that “eligible homeless families lack the ‘legitimate claim of entitlement’ necessary to create a constitutionally protected property right.” Majority opinion at 37 (quoting Roth, 408 U.S. at 577, 92 S.Ct. at 2709) (citation omitted). I believe that under the Family Shelter Act as implemented by the Shelter Office, eligible homeless families[6] have precisely the sort of future interest in emergency shelter that our legal traditions have long regarded as a legitimate property interest. The statute and regulations defining the program and specifying the criteria for eligibility secure the benefit for eligible families, even though they include a contingency which is not certain to occur in the ease of any individual eligible family — the availability of emergency shelter to meet their need. To pursue the analysis a bit further: If, in a given year, the District were to fund the emergency shelter program fully enough to reach all eligible families, then no one suggests that each eligible family would not receive emergency shelter regardless of the degree of discretion accorded to the Shelter Office over the intake procedure. In short, the administering agency does not have discretion to deny emergency shelter to eligible families. If, as is the case now, the amount of shelter available regularly falls short of the need, many statutorily-eligible families must wait until their interests ripen into rights of present possession, just as holders of other future interests wait for specified contingencies to occur such that they may take possession of more traditional forms of property. As with almost any government largesse or “new property,” see Goldberg, 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8, there is the additional understanding that the government may by legislation eliminate the benefit program entirely in the interim. In Goldberg, however, the Supreme Court implicitly held that this inherent power of government to repeal or modify legislative programs does not preclude a potential government benefit from constituting an entitle *-1534 ment that triggers due process protections while the program is in effect. See Goldberg, 397 U.S. at 262, 90 S.Ct. at 1017 (“[welfare benefits] are a matter of statutory entitlement for persons qualified to receive them.”) (citing Charles A. Reich, The New Property, 73 Yale L.J. 733 (1964)).
It is extremely important, then, in any due process entitlement analysis to distinguish between the uncertainty of public shelter stock, which makes the eligible families’ interest in the shelter a contingent future interest, and whatever discretion has been delegated to the Shelter Office to decide the priority in which individual eligible families will be assigned available shelter. The majority suggests that the Shelter Office’s discretion in determining the intake priority for eligible families is utterly unconstrained, such that intake workers may simply choose their favorite eligible family whenever a unit becomes available. But the majority’s premise that the Shelter Office enjoys such “unfettered discretion,” majority opinion at 33, is in fact impossible to reconcile with the regulations governing the administration of the shelter program. These regulations set out in detail the eligibility criteria, see D.C. Mun. Regs. tit. 29, § 2502, and specify that these criteria shall constitute the grounds for the denial of shelter. See id. § 2510.1. Other than those denied shelter based on the unavailability of housing resulting from funding limitations, see id. § 2511.2, any applicant family denied shelter is entitled to notice, “both oral[ ] and in writing,” of the reasons for the denial — “including reference to the law or regulations supporting the action.” Id. § 2511.4. The applicant family may request a “Fair Hearing,” and may include in the request information that may be pertinent to the denial. See id. § 2511.7. At the hearing, the applicant family is entitled to present testimony, witnesses or other evidence, to cross-examine the District’s witnesses, and to be represented by counsel. See id. § 2511.10. When the hearing examiner issues a decision, she must put it in writing, being careful to include findings of fact “based exclusively on evidence presented at the hearing,” and conclusions of law supported by appropriate citations. Id. § 2511.11. Families that fail to secure a favorable result from the Fair Hearing may appeal the final adverse decision to the District of Columbia Court of Appeals. See id. § 2513.1.[7] If, as the majority postulates, an eligible family that reached the top of the waitlist could be passed over for the next available unit pursuant to the Shelter Office’s inscrutable whim or “unfettered discretion,” this extensive set of procedures would be the cruellest of shams. If the Shelter Office had no “law or regulations” to cite in support of its decision to deny them shelter, what earthly purpose would the “Fair Hearing” procedures and review by the District of Columbia Court of Appeals serve? In short, it is beyond my ken that the District painstakingly drafted the blueprints for such an intricate *-1533 structure of procedural protections built atop the quicksand of “unfettered discretion.”[8]
Even if the Shelter Office does have some degree of discretion to determine what system of intake priorities it will use, that sort of administrative discretion is fundamentally and qualitatively different from “unfettered discretion” to determine whether eligible families will receive shelter regardless of its availability. I do not read the statute and regulations to accord the Shelter Office any, let alone “unfettered,” discretion of the latter type. Other courts have identified this distinction as relevant in determining the existence of entitlements to due process procedures. In Eidson v. Pierce, 745 F.2d 453 (7th Cir.1984), the Seventh Circuit ruled that holders of federal housing subsidies had no property interest in particular private housing units because the owners of those units had complete discretion to turn away individual subsidy-holders for any reason or for no reason at all, even when the subsidy-holders had stellar credit and references and an apartment stood empty. See Eidson, 745 F.2d at 461. The Shelter Office, in our case, has no such absolute power to turn away eligible applicants. While the Office presumably could change (and has in fact changed) from a first-come-first-served to a waitlist system, and perhaps could change again to give priority to different specific characteristics of needy families, the fact remains that if at any point in time there is an available unit for an eligible family, the Shelter Office is without authority to turn that family away. See D.C. Mun. Regs. tit. 29, § 2503 (1992) (“At the time of initial application for ... temporary family housing services ... the Department shall inform ,the applicant that he or she is required to provide documentation of eligibility ... The Department shall verify that an applicant is homeless ... The Department shall provide an applicant family determined eligible for temporary family housing a written referral to a designated temporary family housing facility.”).
Indeed, Eidson specifically noted the quintessential difference between programs that distribute scarce benefits according to unfettered discretion and programs whereunder such benefits are distributed according to preset eligibility criteria. Referring to their estrlier decision in Davis v. Ball Memorial Hospital Ass’n, 640 F.2d 30 (7th Cir.1980); the Eidson court distinguished the indigent hospital care program at issue in Davis by observing that “[i]f the patient established facts showing his or her eligibility, and if the hospital had not yet met its financial obligations for the year, then the patient was entitled to the benefits” under the hospital’s first-come-first-served intake system. Eidson, 745 F.2d at 462 (emphasis added). Thus “a hearing in Davis could establish entitlement,” while a hearing for subsidy-holders turned away by private landlords could not. See id. Similarly in our case, if shelter is available and under the existing allocation system no other eligible applicant family has a higher priority, some form of due process procedure would have the practical consequence of ensuring that an eligible applicant family would receive the shelter.
The unfortunate reality that the number of eligible families currently exceeds the number of available shelter units does indeed prevent many eligible families from receiving shelter, but by itself the improbability that a future interest in property will ever vest has never turned cognizable property interests into noncognizable “bare expectations.” For example, the holder of a future interest which trails behind a series of prior life interests may, as a practical matter, have scant chance of ever coming into possession of the property, but he nonetheless holds a legally recognizable interest in the property. Similarly, individual eligible families may have little chance of receiving shelter, but this is essentially a function of the project’s limited funding. One need only conjure up a situation in which available shelter units outnumber eligible applicants to realize that the Shelter Office’s discretionary allocative power is not of the sort that removes the appli *-1532 cants’ claims from the realm of property interests. See supra notes AO-41 and accompanying text; see also Eidson, 745 F.2d at 462; cf. Ressler v. Pierce, 692 F.2d 1212 (9th Cir.1982) (persons within the “class of individuals” intended to benefit from a rent subsidy program have a property interest in the subsidy); Vandermark v. Housing Auth. of York, 663 F.2d 436 (3rd Cir.1981) (applicants for housing subsidy “certificates” have a property interest in the certificates); Baker v. Cincinnati Metro. Hous. Auth., 675 F.2d 836 (6th Cir.1982) (same).
Accordingly, because the interests of eligible families fall squarely within the realm of interests traditionally recognized under the common law of property, families have a right to some due process protection in the intake procedure which determines their eligibility; that right is “triggered” by the nature of the District’s shelter program itself, and by the regulations implementing the program.
Furthermore, the Supreme Court recognized in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), overruled on other grounds by Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), that traditional notions of property do not, by excluding “mere subjective ‘expectancies]’,” id., 408 U.S. at 603, 92 S.Ct. at 2700, preclude individuals from claiming a property interest in a benefit based on the “policies and practices” of the institution controlling the distribution of the benefit. Id.; see also Tarpeh-Doe v. United States, 904 F.2d 719, 724 (1990); Sherrill v. Knight, 569 F.2d 124, 131 n. 22 (D.C.Cir.1977). Institutional “policies and practices” that may create procedural entitlements need not be enshrined in any statute, rule, or regulation; in fact they need not even be written down. See Perry, 408 U.S. at 602, 92 S.Ct. at 2700 (“[T]here may be an unwritten ‘common law” in a particular university that certain employees shall have the equivalent of tenure.”). But in fact, the Waiting List policy is “written down”; it is incorporated into a form that the Shelter Office distributes to all applicant families who have passed a preliminary eligibility determination, that tells them where they are on the waiting list. See Exhibits Volume 1 at 3065 (form bearing the heading “FAMILY SHELTER WAITING LIST IDENTIFICATION FORM,” with a space for the applicant family’s ‘Waiting List number”). What a travesty it would be if the Shelter Office could distribute such Waiting List placements and then blatantly ignore them in handing out shelter to the most impoverished segment of our community. No one has suggested that such a practice would comply with the statute and regulations governing the administration of the shelter program.
Nor can I agree that the Shelter Office’s current Waitlist Policy is incapable of giving rise to an entitlement because “the Shelter Office can change its procedures tomorrow.” Majority opinion at 38. The same of course could have been said of the alleged “common law” tenure system at issue in Perry, which the Court thought might well be entrenched enough to create reasonable expectations deserving of due process protection.[9] Institutional policies or patterns of official action may spawn entitlements while they are in effect; it is their pervasive penetration into the day-to-day practice of an institution and the expectations these practices raise in affected constituencies which is determinative.[10]
*-1531 When an alleged property interest is based in an institution’s policy or practice, rather than in a statute or regulation, a claim of entitlement may sometimes depend on the individual’s own status with regard to the relevant policy or practice. For example, the teacher claiming an entitlement to tenure in Perry premised his claim both on the “common law” tenure system that he alleged had been followed by the university and on the fact that he had been teaching in the institution long enough for his tenure interest to have “vested” under that unwritten system. See Perry, 408 U.S. at 602, 92 S.Ct. at 2700 (“A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service — and from other relevant facts — that he has a legitimate claim of entitlement to job tenure.”) (emphasis added). Similarly, it might be argued that any entitlement created by the waitlist policy currently in effect does not “vest” until a family has reached a certain status vis-a-vis the waitlist such that specific shelter is available to them if they meet eligibility requirements. But even if that were true, eligible families would minimally have a property interest of the Perry variety which “vests” at the point that they reach the top of the waitlist and a unit becomes available for their occupancy. Because the Shelter Office’s current policy and practice is to conduct a final eligibility determination for a family only when a unit becomes available and that family is at the top of the waitlist, see majority opinion at 84, families that have ascended to that pinnacle and can demonstrate their eligibility clearly have a “legitimate claim of entitlement” to the available unit. See Perry, 408 U.S. at 602, 92 S.Ct. at 2700. Indeed the existence of an appeal procedure to control denials of shelter following such determinations attests to the District’s acknowledgment that such families have a reasonable expectation of shelter. See D.C. Mun. Regs, tit. 29, § 2511.1 (1992) (“Any applicant ... who is aggrieved by the Department’s decision to deny ... temporary family housing ... has a right to a fair hearing from the Department’s Office of Fair Hearings, except [if the denial is based on the unavailability of shelter resulting from funding limitations].”).[11]
Finally, it is useful to reiterate that the “entitlement” we are debating here is a far cry from any right to emergency shelter “on demand”; it is nothing more than an interest in shelter which I find sufficiently substantial to implicate the constitutional requirement of regularized procedures in the allocation of what shelter is available to eligible families. The majority seems peculiarly taken with what I regard as an extreme notion — that the statute and implementing regulations *-1530 permit the Shelter Office on a whim or caprice to disclaim all statements it has made to applicant families regarding their priority for receiving shelter pursuant to an intake system that has been in place for months, and perhaps even years, and either announce with no notice or formal procedure a new “allocation scheme for the day” or just choose their favorite families to receive the available shelter units. Nothing I can find in the relevant legislation, regulations, or public statements put out by the Shelter Office suggests the existence of any such “unfettered discretion.” In fact, the regulations mandate the opposite conclusion, explicitly requiring the Shelter Office to deny shelter only to those found ineligible under the law or those for whom no shelter is available.
Because I believe that families at the head of the waiting list who are found eligible for emergency shelter have a constitutionally-protected property interest in available shelter which is deserving of procedural due process protection, I would proceed to the issue of whether the District’s present intake procedures satisfy these strictures.[12] On this due process issue, I respectfully dissent from the majority opinion.

. After articulating these principles, the Court applied them to deny a professor at a state university any "property” interest in continued employment at the university, because the terms of his appointment specifically provided that his employment would terminate on a fixed date, and made no mention of renewal. Roth, 408 U.S. at 578, 92 S.Ct. at 2709-10.

. Contingent remainders are remainders (future interests in someone other than the transferor or his successor in interest that take effect at the termination of a prior estate) that are subject to some' condition precedent other than the termination of all prior estates. See American Law of Property §§ 4.25, 4.36. Thus if A conveys property “to B for life, and if C survives B and lives to attain the age of twenty-one, then to C and his *-1535 heirs,” C has a contingent remainder. See id. at § 4.36.

. Vested remainders subject to complete defea-sance are remainders that are vested (i.e., that become a present estate whenever and however the preceding estates terminate) and that are subject to termination on conditions that may occur before, at, or after the termination of the prior estates. See id. § 4.35. If O conveys property “to A for life, remainder to B and his heirs, but if B die without leaving any children him surviving, then to C and his heirs,” B has a vested remainder subject to complete defeasance. See id.

. Executory interests are future interests in a transferee that cut off another's vested interest immediately upon the occurrence of a specified condition or event. See id. § 4.53. If A conveys property "to B and his heirs, but if B die without leaving children him surviving, then to C and his heirs,” C has an executory interest. See id. § 4.55.

. The majority makes the unsupported assertion that these principles, however forceful they may be “[i]n the realm of real property law,” have no place in the inquiry into whether a "property interest” protected by the Constitution exits. Majority opinion at 37. But the Constitution extends due process protection to deprivations of "property,” an institution which is, and always has been, defined and given substance by real property law. The Supreme Court recognized this in Roth, explicitly incorporating "the ancient institution of properly" into its discussion of the parameters of protected “property” interests. Roth, 408 U.S. at 577, 92 S.Ct. at 2709.

.To be eligible under the applicable statutory and regulatory provisions, families must be homeless, must be willing to pay for shelter if able or to accept vocational training or perform community services in exchange for shelter if unable, must not have occupied emergency family shelter within the previous twelve months, must be current on city taxes, must not have been evicted or expelled from temporary family housing or emergency shelter for drug-related reasons, and must not have been evicted from public housing for failing to accept employment or training without good cause, or for nonpayment of rent. See majority opinion at 33-34.

. The procedures articulated by these regulations are fundamentally unlike those that this court found insufficiently constraining to create a protected interest in Tarpeh-Doe v. United States, 904 F.2d 719 (D.C.Cir.1990). Cf. majority opinion at 37. In Tarpeh-Doe we reviewed the denial of a claim brought under the Federal Tort Claims Act, which authorized but did not require the heads of federal agencies to adjudicate the relevant claims. See id. at 721-22. The agency had in fact issued regulations providing for the adjudication of such claims, but had incorporated neither substantive criteria nor a requirement of any explanation or statement of reasons for denials — a fact which this court singled out as ”[s]ignificant[].” Id. at 722. In this case, the regulations require a written decision based on evidence and conclusions of law supported by citations, and specify only the eligibility criteria listed in the statute and regulations as reasons for denial. In rejecting the claim to a protected interest made in Tarpeh-Doe, this court moreover explicitly noted that no evidence regarding the agency’s “past practice" in dealing with such claims had been presented, and strongly suggested that such evidence might have required a contrary holding. Id. at 724 (“It bears emphasis that we hold only that the language of the statutes and regulations at issue does not, without more, support the district court’s ruling [that a protected interest existed].... It is possible, of course, for a legitimate expectation to arise based upon the consistent practice of a decisional body — even in the absence of express regulatory language or in the face of ostensibly contradictory agency policy statements.”) (emphasis in original) (citing Perry, 408 U.S. at 601-03, 92 S.Ct. at 2699-2700). There is, of course, extensive record evidence in this case regarding the Shelter Office's recent “consistent practice” of distributing shelter according to a "waiting list" system.

. Thus I obviously disagree with the majority’s assertion that the intake procedures which the Shelter Office institutes exist “wholly apart" from any law or regulation. Majority opinion at 12. Far from being "wholly apart” from the regulations, the implementation of an intake procedure constraining “unfettered discretion" is the linchpin without which these regulations would be rendered completely ineffectual.

. The Court affirmed the appeals court’s remand, to give the respondent "an opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.' " Perry, 408 U.S. at 603, 92 S.Ct. at 2700 (citation omitted).

. Although the factual scenario in White v. Office of Personnel Management, 787 F.2d 660 (D.C.Cir.1986), was somewhat similar to this case, I do not think the White decision’s cursory rejection of a due process claim which the plaintiff raised only in his reply brief bars us from finding a property interest in this case. Cf. majority opinion at 38 (citing White). In White, the plaintiff's last-ditch argument apparently was based on his allegation that the elimination of a selection register on which his name had been entered deprived him of his property interest in his place on the selection register. See White, 787 F.2d at 665 ("In his reply brief and at oral argument, White changed his strategy somewhat and asserted that he had been deprived of a protected property interest. He argues that his spot on the selection register constituted such an interest.") (emphasis added). Here eligible homeless families are not asserting a property *-1531 interest in their places on the waiting list, but rather a defeasible interest in the shelter itself. As I pointed out earlier, this interest is capable of vesting as long as the allocation system remains in place. No one suggests the agency cannot change that system through regularized procedures, just as OPM did in the White case. But no such system change has taken place here, and the mere possibility that it could does not divest the applicant family at the top of the list of its property interest.

. I do agree with the majority that the statute’s disclaimer, “[n]othing in this chapter shall be construed to create an entitlement in any homeless person or family to emergency shelter....” D.C. Code Ann. § 3-609, does not by itself control the due process determination. See majority opinion at 38. To the extent that this provision could be read as the City Council's attempt to require this court to construe the Fifth Amendment in a particular way, it is of course without effect. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Rather, the disclaimer is more naturally read as the District's answer to an applicant family's argu- ' ment that the failure to provide enough shelter to reach all eligible families violates the terms of the statute. This is the construction that the District itself has placed upon this provision, by implementing it in the form of a regulation stating that "[ejligibiliiy for temporary housing ... does not entitle a homeless person to shel-ter_” D.C. Mun. Regs. tit., 29, § 2500.3 (1992). (Because I concede that the statute does not require the District to provide a quantity of shelter sufficient to reach all eligible families, I am certainly not suggesting that eligible families hold an “obligation[ ] enforceable against the public fisc.” Majority opinion at 38.) Furthermore, a Perry-type entitlement would not violate the terms of the statutory disclaimer, because such entitlements spring from institutional policies and practices, rather than from the statute alone. The disclaimer only seeks to prevent anything "in th[e] chapter” from being construed as creating an entitlement to shelter.

. In brief, I would affirm the district court's holding that the failure to define criteria establishing which documents are to be considered "reasonably available,” and the essentially arbitrary nature of the appeals process, violate the requirements of due process. See Washington Legal Clinic for the Homeless v. Barry, 918 F.Supp. 440, 456-59 (D.D.C.1996).