Audrey PRICE, et al., Plaintiffs,

v.

Samuel PIERCE, etc., et al., Defendants.

No. 83 C 6291.

United States District Court, N.D. Illinois, E.D.

June 25, 1985.

Kathrine Bissell, Jerry Brask, Prairie State Legal Services, Geneva, Ill., Barnard H. Shapiro, Prairie State Legal Services, Rockford, Ill., Kevin Kane, Prairie State Legal Services, Waukegan, Ill., Karen Engelhardt, Alf Sanford, Cook County Legal Assistance, River Forest, Ill., for plaintiffs.

Dan K. Webb, U.S. Atty., William T. Clabault, Asst. U.S. Atty., Chicago, Ill., Shalom Brilliant, Civ. Div., Washington, D.C., Anthony J. Ciccone, Jr., U.S. Dept. of Housing and Urban Development, Washington, D.C., for Samuel Pierce.

Richard T. Franch, Anton R. Valukas and Darryl M. Bradford, Jenner & Block, Chicago, Ill., for Illinois Housing Development Authority.

Lawrence C. Rubin, Andrew B. David, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Grandwood Gardens Associates.

Jack B. Schmetterer, Elaine S. Fox, Loren J. Mallon, Gottlieb & Schwartz, Chicago, Ill., for Hawthorn Ridge Associates.

Sanford Kahn, Richard Christoff, Sanford Kahn, Ltd., Chicago, Ill., for Vernon Hills Associates II, Trails Venture and Groves of Hidden Creek.

John Powers Crowley, Robert M. Stephenson, Cotsirilos & Crowley, Ltd., Chicago, Ill., for Prairiebrook Venture.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

The Hope Fair Housing Center ("Hope") and the six individually named plaintiffs brought this action against Secretary of Housing and Urban Development Samuel Pierce (the "Secretary"), the Illinois Housing Development Authority ("IHDA"), and the owners of six "Section 8" housing complexes located in this District (the "Developers"). Their complaint seeks "full utilization" of housing subsidies contractually allocated for use by low and moderate income families at the apartment complexes owned by the defendant Developers. Initially, the plaintiffs sought to enforce a policy of full utilization by invoking: (i) their Fifth and Fourteenth Amendment due process rights; (ii) an implied private right of action under the Housing Act of 1937, as amended (referred to as "Section 8"), 42 U.S.C. §§ 1437f *et seq.;* (iii) section 1983 as a remedy for violations of their rights under (i) and (ii); (iv) judicial review of the Secretary's actions pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; (v) their rights as third party beneficiaries under contracts between the Secretary, IHDA and the Developers; and (vi) an implied right of action under the Illinois housing laws.

By order entered November 28, 1983, the Court dismissed the plaintiffs' third party beneficiary claim and refused to recognize an implied private right of action under the Housing Act, but rejected the defendants' assertion that the plaintiffs had no property right in Section 8 benefits sufficient to sustain their due process and § 1983 claims. Also in the November 23rd order, the Court reserved ruling on the defendants' challenge to Hope's standing as a

plaintiff, pending the Seventh Circuit's decision in a similar case.

On April 4, 1984, this Court certified a class of plaintiffs who were financially eligible for Section 8 assistance and otherwise acceptable for tenancy at the defendant Developers' apartment complexes but had been adversely affected by the alleged policy of underutilization.[1] In addition, the Court, acting *sua sponte*, dismissed IHDA as a party defendant to the plaintiffs' § 1983 and state law claims, based on the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). As a result of a series of motions to reconsider, clarify and join additional parties, on November 13, 1984 the plaintiffs filed a fourth amended complaint, which dismissed IHDA as a party defendant and joined IHDA officials A.D. Van Meter and James Kiley (together the "State defendants") as defendants to their due process and § 1983/federal housing act claims.

Currently before the Court are the parties' cross-motions for summary judgment on the claims advanced in the plaintiff's four-count fourth amended complaint (denial of property without due process, violation of rights under the federal housing laws, judicial review of the Secretary's actions, and violation of state housing laws).

### STANDING

■ Initially, the State defendants' challenge to the plaintiffs' standing to maintain this action must be resolved. The State defendants maintain that the Seventh Circuit's decision in *Hope, Inc. v. County of DuPage,* 738 F.2d 797 (7th Cir.1984), mandates a finding that neither Hope nor the individual plaintiffs have standing to maintain this action. In *County of DuPage,* the Seventh Circuit found that the plaintiffs lacked standing to challenge alleged County Board practices where they had failed to identify specific housing projects affected by the challenged practices, as required by *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct.

2197, 45 L.Ed.2d 343 (1975). *County of DuPage* is no bar to the standing of the individual plaintiffs here, as they have alleged (and shown) that the challenged practice of "underutilization" affected the availability of housing at six specific apartment complexes where they are applicants for housing.

■ This Court reserved ruling on Hope's asserted standing as a representative of its members and in its own right while the *County of DuPage* was being argued. The Seventh Circuit did not base its ruling on grounds which would differentiate Hope from the individual plaintiffs. Rather, the Seventh Circuit found that since Hope's standing was no better than that of the individual plaintiffs, it too lacked standing. *County of DuPage* also refused to expand Hope's representational standing beyond its members to include all those for whom Hope seeks housing. Here, Hope has presented the claim of particularized injury that was lacking in *County of DuPage.* Hence, Hope has standing both as a representative of its members (who are otherwise within the class as certified) and in its own right to maintain this action. *See Havens Realty Co. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

### DUE PROCESS CLAIMS

All defendants assert that in light of the Seventh Circuit's recent decision in *Eidson v. Pierce,* 745 F.2d 453 (7th Cir.1984), the plaintiffs' due process claims fail for want of a property right requiring due process protection. The State defendants go on to assert that *Eidson* also precludes the plaintiffs' § 1983 claim, which is based upon a violation of purported rights established by the federal housing laws.

*Eidson* involved an effort by applicants for Section 8 housing at apartment complexes in Indiana and Wisconsin to secure hearings and a written explanation of the reasons for their rejection by project owners. As do the plaintiffs in this action, the

---

**1.** The precise definition of the class is set forth at p. 11 of the April 4th order.

*Eidson* plaintiffs argued that financially eligible applicants enjoy a property right to Section 8 benefits deserving due process protection. The Seventh Circuit flatly rejected their asserted property right.

The plaintiffs contend that this case is distinguishable from *Eidson* as it involves a challenge to the total amount of Section 8 housing available to all applicants rather than "the process used to allocate these limited and valuable benefits among a large number of eligible applicants" examined in *Eidson.* 745 F.2d at 457. However, a fair reading of *Eidson* does not support this distinction. This Court's November 23rd order, which denied the defendants' motion to dismiss the due process claim, recognized but rejected the tenant/applicant distinction adopted by the district courts in *Eidson* and *Germain v. Recht-Goldin-Seigel Properties* (consolidated on appeal with *Eidson*). In rejecting the tenant/applicant distinction, this Court relied upon *Ressler v. Pierce,* 692 F.2d 1212 (9th Cir.1982) and *Davis v. Ball Memorial Hospital Ass'n,* 640 F.2d 30 (7th Cir.1980). However, in *Eidson* the Seventh Circuit adopted the tenant/applicant distinction, rejected the rationale of *Ressler* and limited the reach of *Davis.* The relevant distinction mandated by *Eidson* is between tenant and applicant rather than the distinction suggested by the plaintiffs between procedural rights to preserve the existing amount of available housing for all applicants and procedures to allocate housing among applicants. Since the plaintiffs here are all applicants, their due process claims are foreclosed by *Eidson.*

### SECTION 1983 CLAIM

Moreover, *Eidson* also defeats plaintiffs' § 1983 claims based on the federal housing statute. The plaintiffs rely upon *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), for the proposition that "a federal statute creating enforceable rights may be enforced in a Section 1983 action," despite the absence of any implied private right of action under the statute itself. However, the plaintiffs' argument assumes its conclusion. The Seventh Circuit in *Eidson* found that "there is nothing to suggest that Congress intended potential tenants of Section 8 projects to have enforceable rights to Section 8 housing in particular projects." 745 F.2d at 462.

The Supreme Court has recognized two exceptions to the application of § 1983 to federal statutes, one of which precludes plaintiffs' § 1983 claim. No § 1983 claim may be based on a federal statute which fails to create "enforceable rights." *See Middlesex City Sewerage Authority v. Sea Clammers,* 453 U.S. 1, 9, 101 S.Ct. 2615, 2620, 69 L.Ed.2d 435 (1981) (explaining *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)). *See also Gould, Inc. v. Wisconsin Dept. of Industry, Labor & Human Relations,* 750 F.2d 608, 615–16 (7th Cir.1984); *Polchowski v. Gorris,* 714 F.2d 749, 750–51 (7th Cir.1983). Thus, the plaintiffs' § 1983 claim rises or falls with its due process claim, as both assert 42 U.S.C. § 1437f to be the source of enforceable rights. Since *Eidson* has established that applicants (as opposed to tenants) for Section 8 housing have no "enforceable right" to benefits, see 745 F.2d 461 n. 6, that portion of the federal housing law provides no basis for a § 1983 claim. *Accord Phelps v. Housing Authority of Woodruff,* 742 F.2d 816, 820–22 (4th Cir.1984). *But see Tedder v. Housing Authority of Paducah,* 574 F.Supp. 240, 246–48 (W.D.Ky.1983).

### STATE LAW CLAIMS

Due to the disposition of the plaintiffs' due process and § 1983 claims, their pendent claims based on state housing statutes, must be dismissed. After the entry of summary judgment on Counts I and II, the only claim remaining against the defendant Developers is the plaintiffs' claim under the state housing laws (Count IV). In the absence of benefits in the form of judicial economy, convenience or fairness to litigants, "federal courts should be reluctant" to adjudicate state law claims. *Buethe v. Britt Airlines, Inc.,* 749 F.2d

**178**

1235, 1240 (7th Cir.1984) (quoting *Smith v. No. 2 Galesburg Crown Finance Corp.*, 615 F.2d 407 (7th Cir.1980). Such a reluctance should be particularly pronounced where the state law claim involves an issue of first impression or an unsettled area of state law as is presented here. *Buethe*, 749 F.2d at 1240–41. In addition, the plaintiffs' state law claim against the Developers is a pendent party claim not closely related to the remaining federal law claim against the Secretary. *Compare Berstein v. Lind-Waldock & Co.*, 738 F.2d 179, 187–88 (7th Cir.1984) with *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1359–63 (7th Cir.1985). For these reasons, the plaintiffs' state law claim is dismissed without prejudice.

### ADMINISTRATIVE REVIEW CLAIMS

The plaintiffs' remaining claims are that the Secretary has: (i) unlawfully withheld action which would compel the Developers and IHDA to fully utilize authorized Section 8 subsidies; and (ii) abused his discretion by approving proposed contact modifications which would reduce the number of authorized Section 8 units at five of the six apartment complexes involved in this action.

▪ Section 706(1) of the APA, 5 U.S.C. § 706(1) empowers federal courts to "compel agency action *unlawfully* withheld" (emphasis added). Judicial review of claims of agency inaction is extremely limited. *Illinois Bell Telephone Co. v. F.C.C.*, 740 F.2d 465, 475–76 (7th Cir.1984). Further, the Secretary enjoys considerable discretion in making enforcement decisions. *See United States v. OCCI Co.*, 758 F.2d 1160, 1164–65 (7th Cir.1985) (foreclosure on federally insured mortgage for low and moderate income housing project). The Secretary argues that his failure to take action to remedy the underutilization at the five apartment complexes owned by the defendant Developers was not unlawful, as no applicable statute required full utilization.

▪ The plaintiffs concede that the 1981 amendments to Section 8 do not apply to the apartment complexes here at issue. Although Congress mandated full utilization as part of the 1981 amendments, it provided that the full utilization requirement would apply only to contracts entered into on or after October 1, 1981. PL 97–35 §§ 325(1) and 371(b), 95 Stat. 406, 431 (Aug. 13, 1981). Plaintiffs' attempt to construct a statutory requirement of full utilization from various other portions of Section 8 is unpersuasive. Thus, the Secretary's failure to act was not unlawful and enforcement action cannot be compelled under 5 U.S.C § 706(1).

▪ The Secretary's approval of a reduction in the number of Section 8 assisted units at five of the six apartment complexes, however, stands on a different footing. Pursuant to 5 U.S.C. § 706(2)(A), this Court must review the Secretary's decision to determine "whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Nonetheless, this standard of review is also narrow and this Court may not "substitute its judgment for that of the agency." *Id.* Even where an abuse of discretion is shown, the proper remedy is a remand to the Secretary rather than the substitution of this Court's judgment for that of the Secretary. *Flynn v. Schultz*, 748 F.2d 1186, 1194 (7th Cir.1984). With this deferential standard in mind, the Court examines the record supporting the Secretary's decision.

Under the Section 8 program, the Secretary is authorized to implement the program by entering into annual contributions contracts ("ACC") with a "public housing agency," pursuant to which such agency may enter into housing assistance payments ("HAP") contracts with owners of dwelling units to assist eligible persons. IHDA is a public housing agency within the meaning of federal statute and is governed by federal regulations at 24 C.F.R. § 883.101, *et seq*. IHDA was established

pursuant to Illinois state law. Ill.Rev.Stat. ch. 67½, ¶ 301 *et seq.* IHDA has provided "assisted mortgage financing" [2] for each of the six developments in this action, pursuant to state statute. Ill.Rev.Stat. ch. 67½, ¶ 307.2.

### (1) Trails Venture

The Moorings, located in DuPage County, is owned by defendant Trails Venture, an Illinois limited partnership. In 1976, IHDA requested that the Department of Housing and Urban Development ("HUD") increase the Section 8 subsidy allocation at the Moorings to 40% (86 units) of the dwelling units of that development. IHDA stated in part:

As always the Authority evaluates the economic housing needs of each community where a project is proposed and correspondingly requests the appropriate amount of housing subsidies required for the community to be served as determined by our housing need study ... It is our conclusion, after analyzing present housing cost and family income patterns, that 40% of the dwelling units should be assisted with Section 8 housing assistance payments in conformance with our housing needs study ... In view of the foregoing, it is imperative that the subsidy be available to allow us to assist very low, low and moderate income families in the spirit and intent of the congressional mandate enumerated through the Housing and Community Development Act of 1974.

On April 7, 1976, HUD approved the IHDA proposal for the Moorings. On May 4, 1976, HUD and IHDA signed an ACC for the purpose of making Section 8 subsidies available for 86 units at the Moorings through execution of a HAP contract with the owner. On May 4, 1976, IHDA and defendant Trails Venture signed, and HUD subsequently approved, an Agreement to Enter Into HAP Contract, "for the purpose of making housing payments to enable eligible Lower-Income Families to occupy units in said project."

In March, 1977, IHDA and Trails Venture signed a HAP contract, approved by HUD in May, 1977, providing in part that:

The Contract Units [§ 8 units] are to be leased by the owner to eligible lower-income families ("Families") for use and occupancy by such families solely as private dwellings ... The HFA [IHDA] hereby agrees to make housing assistance payments on behalf of families for the contract units to enable such families to Decent, Safe and Sanitary Housing pursuant to Section 8 of the Act.

From the time of initial occupancy until September 1983, the Moorings rented no more than 43 apartments to eligible low income tenants. On August 26, 1983, IHDA and Trails Venture amended the contracts, reducing the available Section 8 allocation from 86 to 68 Section 8 units. HUD approved this change.

### (2) Arrowhead Apartment Associates

Arrowhead Village, located in Cook County, is owned by defendant Arrowhead Apartment Associates, an Illinois limited partnership. Arrowhead Village was previously owned by defendant Groves of Hidden Creek, an Illinois limited partnership.

In 1976, IHDA by and through its Director, requested from HUD an increase in the Section 8 subsidy allocation at Arrowhead Village to 40% of the dwelling units at that development (80 units). IHDA made the identical representation quoted at page 11 of this opinion.

On February 12, 1976, HUD approved the IHDA proposal for Arrowhead. On June 30, 1976, HUD and IHDA signed an ACC for the purpose of making Section 8 subsidies available (80 units) at the Groves of Hidden Creek through execution of a HAP contract with the owner and HUD subsequently approved the agreement. On March 24, 1976, IHDA and Groves of Hidden Creek signed a HAP contract, approved by HUD in May, 1977, containing the identical provision quoted at page 179 of this opinion.

---

**2.** Under Illinois law "assisted mortgage financing" means a below market rate mortgage, insured or purchased, in combination with a program of rent supplements and other grants.

On April 19, 1982 in a letter to Arrowhead Village, HUD Area Manager Elmer Binford stated:

We are deeply concerned since our records indicate that of the 80 units under your Section 8 Contract, less than 50% (39 units) are currently under lease to eligible Section 8 tenants. Current regulations found in 24 CFR Part 883.-605(a) require that no more than 10% of assisted units be leased to ineligible tenants without prior HUD and State Agency (IHDA) approval. Failure to lease to eligible tenants is a violation of your Contract and constitutes grounds for all available legal remedies, including specific performance of the Contract suspension or debarrent [sic] from HUD programs and reduction of the number of units under the Contract.

Within 10 days following your receipt of this letter, we request your written response to the charge made by Mr. Barnett and a justification of your failure to lease Section 8 units to eligible tenants. A copy of this letter is being forwarded to the Illinois Housing Development Authority.

On June 9, 1982, in a letter to Arrowhead Apartments, HUD area manager Elmer Binford stated:

Regarding the matter of your agency's failure to lease Section 8 units to eligible tenants, your response completely ignores this issue. In addition, you have provided us a copy of a response to the Barnetts from Donnell D. Jenkins, Amdur Associates, Inc., Property Manager, that contains statements that contradict information contained on official HUD reports. Specifically, HUD Form 52684, Report on Program Utilization, which was filed on behalf of Arrowhead Apartments, by the Illinois Housing Development Authority indicates that as of January 13, 1981 only 39 of 80 units (50%) were leased to eligible tenants. Further information received by this office indicates that as of May, 1982, this situation has not improved. Any unauthorized policy of leasing to ineligible tenants

above the allowable program limit results in the unlawful deprivation of Federally-funded rental assistance to eligible Section 8 applicants. This policy is especially disturbing since your agency acknowledges a very lengthy waiting list for Section 8 at Arrowhead.

As was indicated in our letter of April 19, 1982, failure to lease to eligible tenants is a violation of your Housing Assistance Payments contract and grounds for all available legal remedies. In addition, your unauthorized policy has the effect of depriving those eligible families of their constitutional right to participate in this Federally-funded program.

On June 15, 1982, in a letter to IHDA deputy Director, Peter Dwars, HUD Area Manager Elmer Binford stated:

Recently, it has come to our attention that IL06–H121–007, Arrowhead Village, has consistently violated Federal regulations by leasing Section 8 units to ineligible tenants in a percentage that exceeds statutory limits. We had requested that the owner of this project provide this office with some clarification of this unauthorized procedure. As the result of our request, we were informed by an IHDA employee that your agency would provide an adequate response.

In a June 15, 1981, letter from Mr. Delong, we were provided with a response that we feel is less than adequate. We concur in Mr. Delong's analysis that this project is governed by regulations that were in effect prior to February 29, 1980, however, we are not aware of any Federal regulations that allow a project owner to lease more than 20% of its Section 8 units to ineligible tenants. IL06–H121–007 has consistently leased more than 50% of its Section 8 units to ineligible families.

We would appreciate your response to this matter inasmuch as our records show that this project is being managed in violation of Federal regulations.

From the time of initial occupancy until September, 1983, Arrowhead rented no

more than 40 apartments to eligible low income tenants.

On August 26, 1983, IHDA and Arrowhead changed the contracts, reducing the available Section 8 allocation from 128 to 110 units. HUD approved the change.

### (3) Hawthorn Ridge Associates

Hawthorn Ridge Apartments ("Hawthorn"), located in DuPage County, Illinois, is owned by defendant Hawthorn Ridge Associates, an Illinois limited partnership.

On December 11, 1975, and in January, 1976, IHDA requested from HUD an increase in the Section 8 subsidy allocation of Hawthorn to 40% of the dwelling units at that development (70 units). IHDA stated in part on January 7th:

> This change is requested as a result of our recent analysis of the economic impact of market rate rents for new construction in light of present and projected recession and inflation trends. In our opinion, only a small minority of the families in the Village of Woodridge are able to afford dwelling units which are not 100% subsidized.

On December 23, 1975, HUD approved the IHDA proposal for Hawthorn. In December, 1975, HUD and IHDA signed an ACC for the purpose of making Section 8 subsidies available for 76 units at Hawthorn through execution of a HAP contract with the owner. In December, 1975, IHDA and Hawthorn Ridge Associates signed, and HUD subsequently approved, an agreement. On April 25, 1977, IHDA and Hawthorn Ridge Associates signed a HAP contract, approved by HUD in May 1977, providing in part that:

> The Contract units [§ 8 units] are to be leased by the owner to eligible lower-income families ("Families") for use and occupancy by such families solely as private dwellings" ... The HFA (IHDA] hereby agrees to make housing assistance payments on behalf of families for the contract units to enable such families to lease Decent, Safe and Sanitary Housing pursuant to Section 8 of the act.

From the time of initial occupancy to September, 1983, Hawthorn rented no more than approximately 35 apartments to eligible low income tenants. On August 26, 1983, with HUD approval, IHDA and Hawthorn Ridge Associates changed the contracts, reducing the available Section 8 allocation from 70 to 52 Section 8 units.

### (4) Vernon Hills Associates II

Pebbleshire II, located in Cook County, is owned by defendant Vernon Hills Associates II, an Illinois limited partnership. On January 7, 1976, IHDA requested from HUD an increase in the Section 8 subsidy allocation at Pebbleshire II to 40% of the dwelling units at that development (58 units). IHDA supported its request with the statement quoted at page 179 of this opinion.

On September 20, 1976, HUD approved the IHDA proposal for Pebbleshire II. In July and September, 1976, HUD and IHDA signed an ACC for the purpose of making Section 8 subsidies available at Pebbleshire II through execution of a HAP contract with the owner. On September 22, 1976, IHDA and Vernon Hills Associates II signed, and HUD subsequently approved an agreement. On December 30, 1977, IHDA and Vernon Hills Associates II signed a HAP contract, approved by HUD on March 10, 1978 providing in part that:

> The Contract Units [58 Units] are to be leased by the owner to eligible low-income families for use and occupancy by such families as private dwellings ... The HFA [IHDA] hereby agrees to make housing assistance payments on behalf of families for the contract units to enable such families to lease Decent, Safe and Sanitary Housing pursuant to Section 8 of the Act.

From the time of initial occupancy until September, 1983, Pebbleshire II rented no more than 29 apartments to eligible low income tenants. On August 26, 1983, IHDA and Vernon Hills Associates II changed the contracts, with HUD approval, reducing the available Section 8 allocation from 58 to 40 Section 8 units.

#### (5) PRAIRIEBROOK VENTURE

Prairiebrook, located in Lake County, is owned by defendant Prairiebrook Venture, an Illinois limited partnership. On October 30, 1975, HUD approved the Prairiebrook proposal to provide 320 units of housing, of which 128 units were to be subject to contract for Section 8 subsidies on behalf of lower income families. IHDA certified, according to federal regulations, that the authority had found a need for housing assistance for the number and size of the units applied in the subject development based upon its approved housing needs study.

On October 31, 1975, HUD and IHDA signed an ACC for the purpose of making Section 8 subsidies available at Prairiebrook through execution of a HAP contract with the owner. In September and October, 1975, IHDA and Prairiebrook Venture signed, and HUD subsequently approved an agreement. In 1977, IHDA and Prairiebrook Venture signed a HAP contract approved by HUD in May, 1977, providing in part that:

> The Contract Units [§ 8 Units] are to be leased by the owner to eligible low-income families for use and occupancy by such families as private dwellings ... The HFA [IHDA] hereby agrees to make housing assistance payments on behalf of families for the contract units to enable such families to lease Decent, Safe and Sanitary Housing pursuant to Section 8 of the Act.

From the time of initial occupancy until September, 1983, Prairiebrook rented no more than 64 units to eligible low income tenants. On August 26, 1983, IHDA and Prairiebrook Venture changed the contracts, reducing the available Section 8 allocation from 128 to 110 units. HUD approved this change.

#### (6) Grandwood Gardens Associates

Grand Oaks, located in Lake County, is owned by defendant Grandwood Gardens Associates, an Illinois limited partnership. In 1976, IHDA requested from HUD an increase in the Section 8 subsidy allocation at Grand Oaks to 40% of the dwelling units at that development (60 units). IHDA supported its request by the identical representation quoted at page 179 of this opinion. On March 5, 1976, HUD approved the IHDA proposal for Grand Oaks "to provide 150 units of housing of which 60 units are to be the subject of a contract for the making of housing assistance payments on behalf of eligible lower-income families leasing such units."

In May and July 1976, HUD and IHDA signed an ACC for the purpose of making Section 8 subsidies available at Grand Oaks through execution of a HAP contract with the owner. On March 17, 1976, IHDA and Grandwood Gardens signed, and HUD subsequently approved an agreement. In March and May, 1976, IHDA and Grandwood Gardens Associates signed a HAP contract, approved by HUD in May, 1977, providing in part that:

> The Contract Units [§ 8 Units] are to be leased by the owner to eligible low-income families for use and occupancy by such families as private dwellings ... The HFA [IHDA] hereby agrees to make housing assistance payments on behalf of families for the contract units to enable such families to lease Decent, Safe and Sanitary Housing pursuant to Section 8 of the Act.

From the time of initial occupancy until November 1, 1984, Grand Oaks rented no more than 30 units to eligible low income tenants, except for a period in which it received permission from IHDA to rent up to 36 units to Section 8 families.

On October 9, 1980, in a letter to IHDA, Amder Associates stated regarding Grand Oaks:

> "Thank you for recognizing the occupancy problem existing at Grand Oaks, and for permitting us to increase our subsidized occupancy by six apartment units. We understand that this increase is to be a temporary measure. It is our intention to bring the subsidized occupancy back to the 20% design allocation as conditions permit."

By letters dated July 27, 1983 and July 28, 1983, IHDA, without any detailed statement of its reasons, requested that the Secretary transfer Section 8 authorizations for a total of ninety units from five of the involved apartment complexes (18 from each complex) in DuPage, Cook and Lake Counties to Grand Oaks in Lake County. The effect of the proposal would have been to make Grand Oak's a 100% subsidized project and also to remove units from Du-Page and Cook Counties. The June 27th IHDA letter states that the reductions are proposed "to provide for the needed increase [at Grand Oaks]." The July 28th IHDA letter states that the reductions in assisted units at the five complexes are "contemplated if and only if the recaptured funding is assigned" to Grand Oaks.

Without any discussion, by letter dated August 31, 1983, the Secretary approved reductions of 18 units each in the Section 8 authorizations of the five apartment complexes, as requested by IHDA. Also on August 31, 1983, Chicago Area Manager Everett H. Rothschild wrote to IHDA approving the increase in Section 8 units at Grand Oaks and explaining that the increase was to be funded by the decreases at the other complexes (this approval was apparently not the final word). By letters dated September 30, 1983, IHDA notified each of the Developers except Grandwood Garden Associates of the Secretary's approval, enclosing the approved contract amendments.

On September 15, 1983, the Lake County Department of Planning, Zoning and Environmental Quality advised HUD that the proposal to convert Grand Oaks to 100% Section 8 occupancy was "unacceptable" and "inconsistent with Lake County's Housing Assistance Plan." The County also complained that the project would become identified as a low income dwelling which would be inconsistent with the Section 8 program. On December 29, 1983, IHDA wrote the Secretary, urging approval of the Grand Oaks proposal and stating "the re-allocation strategy contemplated is attractive to us for the reason that it preserves the total number of subsidized units." Although the record fails to disclose any direct communication between the Developers and the Secretary regarding IHDA's proposal, IHDA's letter of December 29th indicates that its proposal is "an acceptable allocation insofar as the owners are concerned."

On March 19, 1984, the Secretary rejected the increase in the Section 8 authorization for Grand Oaks originating from the reductions approved on August 31, 1983. The Secretary stated that Grand Oaks was no longer eligible for "new construction" funds, such as those recaptured on August 31, 1983 and that recaptured Section 8 funds were required to be applied to elderly or handicapped housing projects under certain 1983 amendments to the federal housing laws. The Secretary also indicated that the August 31, 1983 reductions could be rescinded if certain conditions at the five complexes (including full utilization of the reduced level of assisted units and a promise that the "additional" units would be fully utilized) were satisfied.

In support of his actions, the Secretary presents generalized arguments as to the validity of regulations delegating authority to seek reductions in Section 8 units to state housing agencies. 24 C.F.R. § 883.-327. The Secretary points out that under these regulations state housing agencies have discretion to seek such reductions, subject to HUD approval. The Secretary notes that state housing agencies develop and finance "new construction" Section 8 projects. Consequently, they possess the expertise to properly allocate assisted units and the incentive to see that state funds expended to build these projects are well spent (through maximum utilization of federal Section 8 funds). Although the Secretary attempts to portray IHDA as the repository of discretion in these matters, HUD does not (and could not) simply "rubber stamp" all IHDA proposals.

This Court need not decide whether these generalized justifications for the Secretary's reliance (at least in the first instance) upon recommendations by state

housing agencies are or are not reasonable, for in this specific agency action they lend no support to the Secretary's decision on this administrative record. The Secretary cannot profess his reliance upon IHDA's expertise yet ignore the central purpose of IHDA's proposal. In its letter of December 29, 1983, IHDA labelled the result of the Secretary's decision to be "perverse" and "unacceptable to the Authority." This is not to say that the Secretary must accept or reject IHDA proposals *en toto*. But here the Secretary eliminated ninety Section 8 assisted units from the DuPage, Cook and Lake Counties without *any* consideration of the effect of such an action, including the availability of low income housing in those areas.

 IHDA's evaluation, upon which the Secretary assertedly relied, considered at most the effect of a transfer of these units from five complexes with a subsidized/market rate unit mix of roughly 40%/60% to a complex that would become a 100% subsidized housing project. IHDA contemplated transfer rather than a reduction. Hence IHDA's effort, (none of which have been made a part of the record), along with any evaluation performed by HUD's Chicago office during the month in which the reductions were pending prior to approval, assuming any were made (no such evaluations have been made a part of the record in this action), did not address the elimination of ninety assisted units from the market, which is the effect of the Secretary's action.[3]

The Secretary's failure to consider this "relevant fact" alone requires that his action be vacated and remanded.

In a report by the Comptroller General of the United States to Congress dated April 27, 1981 entitled "Lenient Rules Abet The Occupancy Of Low Income Housing By Ineligible Tenants," cites Chicago as an area with chronic problems of underutilization at "partially assisted" projects, such as those involved here. In his report, the Comptroller stated:

> The occupancy of section 8 housing by ineligible households is a significant and costly problem. Although program rules allow some leeway for owners to rent units under section 8 assistance contracts to households ineligible to receive assistance, the rules are too lenient and some owners ignore them. Although ineligible tenants receive no direct subsidies, they do benefit from large, indirect financing subsidies and displace needy households.

In response to the investigation conducted by the Comptroller, the Secretary described the options available to him when owners fail to rent to eligible low-income tenants and underutilize the set aside units. In a letter to the General Accounting Office ("GAO"), dated October 22, 1980 (Appendix VII, to the April 27, 1981 Report) the Secretary stated as follows:

> The new Section 8 Housing Assistance Payments (HAP) Contract has expanded the tools HUD may use to enforce owner compliance with the limitation on admission of market rate tenants. The owner's failure to comply with this limitation is considered a default under the Contract. The options available to HUD (and the contract administrator) upon owner default include:
>
> —reduction or suspension of housing assistance payments to the owner;
>
> —denial of owner/agent participation in HUD programs until compliance is achieved, pursuant to the 2530 clearance process or temporary denial;
>
> —reduction of the number of units under the Contract; and

---

3. Although the Secretary did indicate that the units eliminated could be restored, the showing of full utilization and additional demand required for restoration decidedly alters to *status quo ante.* Prior to the reductions, no such showing was required to maintain existing authorization levels and the complexes had not fully utilized all authorized Section 8 subsidized units. Further, IHDA chose to transfer the unutilized units rather than push for an increase in utilization at the five apartment complexes. The Secretary's decision has deprived IHDA of its alternative option of vigorous contract enforcement, and indeed, of any choice in the matter.

—HUD assumption of control of project operations, including rent collection and payment of necessary expenses, through appointment of a receiver or obtainment of mortgagee-in-possession status.

While all these remedies are available, the most effective seems to be the reduction or suspension of assistance payments until the owner complies with the terms of the Contract. HUD assumption of control would be used only in the most extreme cases, where an owner has consistently and deliberately violated the terms of the Contract. *The least attractive remedy is reduction of the number of units under the Contract since this may be what an owner is trying to achieve. However, this may be a remedy of last resort.* (emphasis added).

The problem of how to provide and allocate scarce low-cost housing to low-income persons is one that challenges legislatures, governmental agencies, urban planners and developers. It is essential that decisions in this area by government officials be clear and consistent with announced policy. This is especially important with respect to housing decisions because of the limited scope of judicial review and relief available to persons aggrieved, such as the plaintiffs in this action. Without explanation, or other attempts to secure the Developers' compliance, the Secretary implemented the "least attractive" "remedy of last resort"

which he realized would operate to reward project owners for their past efforts to evade the obligations under the HAP contracts. Further, although Congress had chosen not to apply the 1981 full utilization policy retroactively, it had clearly demonstrated its preference for such a policy. In light of the admonitions of the GAO, the Secretary's own response and the spirit of the 1981 amendments to Section 8, it was incumbent on the Secretary to consider carefully action which rewarded past underutilization and explain fully his reasons for approving the reductions.

Since the Secretary's decision was clearly not based on considerations of all relevant factors, including the Secretary's own policy and regulations [4] and the prior administrative record which set forth the history of increased allocations and underutilization at each complex, the decisions to reduce subsidized units and to eliminate eligible units must be vacated, set aside and remanded for reconsideration.

IT IS THEREFORE ORDERED that:

(1) The non-federal defendants' motion for summary judgment is granted. Judgment will enter on Counts I and II against the plaintiffs and in favor of James Kiley, A.D. Van Meter and the defendant Developers.

(2) Count IV of the fourth amended complaint is dismissed without prejudice.

---

4. On June 14, 1985, the plaintiffs requested (and were subsequently given) leave to file as an additional exhibit HUD Transmittal No. 4350.3 Chg–1, issued 3/7/85 (the "Handbook") as an interpretation by the Secretary of the governing statutes and regulations. *See Burroughs v. Hills,* 741 F.2d 1525, 1529 (7th Cir.1984) (HUD Handbook is without binding force on court but is entitled to notice as an official interpretation of statutes or regulations with which it is not in conflict). A portion of this Handbook addresses the conditions upon which an apartment complex owner may lease apartments allocated under ACC and HAP contracts for Section 8 recipients to persons ineligible for Section 8 assistance (i.e., the extent of permissible underutilization). The Court does not rely upon this document for its holding, although it arguably provides yet another articulation of agency enforcement policy which is inconsistent with the Secretary's challenged actions. However, the Court

notes that the Secretary's attempts to explain away the Handbook provisions are notably unpersuasive (e.g., "provision stating that owners may rent 'up to' 20% of their contract units to ineligibles does not mean that these owners cannot rent more than 20% to ineligibles [as that is merely the point at which the state housing agency may initiate sanctions];" "the Handbook was *never* meant to suggest such a reading ... [and] the Handbook will be revised to clarify this matter." Although Section 8 was a fledgling program with an uncertain future when the Developers signed the contracts at issue here, by the time the Secretary made the challenged reductions, Section 8 had become a successful and established program. Accordingly, the logic of the Secretary's argument that he is bound to exercise his discretion as to contracts signed in the mid-1970's differently than those signed after 1981 is not self-evident.

(3) The Secretary's motion for summary judgment is granted in part and denied in part. Judgment will enter in favor of the Secretary and against the plaintiffs on Count I of the fourth amended complaint and that portion of Count III directed to the Secretary's enforcement policies.

(4) The plaintiffs' motion for summary judgment is granted in part and denied in part. The Secretary's decision as expressed in letters of August 31, 1983 and March 19, 1984 is vacated and remanded to the Secretary for further consideration.